IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

OSCAR RICARDO TOVAR,                    §
                                        §
            Petitioner,                 §
                                        §
V.                                      §          No. 3:13-cv-2197-N-BN
                                        §
WILLIAM STEPHENS, Director              §
Texas Department of Criminal Justice    §
Correctional Institutions Division,     §
                                        §
            Respondent.                 §

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Petitioner Oscar Ricardo Tovar, a Texas prisoner, has filed an application for

writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons explained below,

the application should be denied.

**Background**

Petitioner was charged with capital murder by a Dallas County grand jury. On

December 14, 2005, a jury acquitted him of capital murder but found him guilty of the

lesser included offense of murder. He was sentenced to seventy years' imprisonment,

and his conviction was affirmed on direct appeal. *See Tovar v. State*, No. 08-06-00157-

CR, 2008 WL 2133140 (Tex. App.–El Paso, May 22, 2008, no pet.).

Petitioner did not file a petition for discretionary review, *see* Dkt. No. 10-1, but

instead filed a state writ of habeas corpus. His state writ was ultimately denied by the

Texas Court of Criminal Appeals without a written order on the findings of the trial

court without a hearing, on June 12, 2013. *See Ex parte Tovar*, No. 79, 612-01 (Tex.

Crim. App. June 6, 2013). The petition now before the Court [Dkt. No. 1] was filed the same day. A brief in support of the petition [Dkt. No. 3] was filed July 1, 2013. And Respondent filed his answer and brief in support [Dkt. No. 10] on September 26, 2013, but no reply was filed.

The El Paso Court of Appeals set out a lengthy summary of the evidence. *See Tovar*, 2008 WL 2133140, at *1-*3. Because the claims Petitioner presents implicate the evidence considered at his trial, the Court of Appeals's entire summary of the evidence is excerpted below:

> On November 17, 2004, [Petitioner] and his uncle, Elizardo Guzman, the decedent, got into an altercation regarding the division of the proceeds from property that they had stolen from [Petitioner's] grandmother (who is also Guzman's mother). Afterward, [Petitioner] called Guzman's wife and related that her husband had hit him in the eye and that he was looking for him. [Petitioner] was angry, and he stated that he was not going to let Guzman get away with it. Guzman's wife testified that [Petitioner] and his uncle had a close relationship. She also stated that the deceased weighed over 200 pounds and was six feet tall, which made him much larger than [Petitioner].
>
> On November 17, 2004, Diane Gonzalez was living in Apt. 104 of the Hamilton Apartments at 1211 Garden View in Dallas. Her family lived in Apt. 102. At sometime after 9 p.m., she and a friend, Justo Chavez, were seated on her doorstep when Guzman, a family friend whom she had known for six years, walked up to them and stated that he and [Petitioner] had gotten into a fight that evening. Guzman told them that he and [Petitioner] were in a car and that [Petitioner] was trying "to be bad in front of his girlfriend" and [Petitioner] "put him out of the car." Guzman went to the other apartment to say hello to Gonzalez's mother, Berta Villareal; meanwhile, Gonzalez went into her apartment to use the restroom.
>
> When Gonzalez came out of her apartment, a blue car pulled up. The driver was an African–American female, and [Petitioner] was seated on the front passenger seat. [Petitioner] had bruises and scrapes on his face. [Petitioner] called to Gonzalez and asked for Guzman's whereabouts. She

stated that Guzman was in her mother's apartment, and [Petitioner] told her to go and call him. As Gonzalez walked toward the apartment, [Petitioner] got out of the car and opened its back door. Gonzalez heard a gunshot, and she heard a shell casing striking the ground. She saw [Petitioner] cock the gun, and he walked towards the apartment, yelling for Guzman to "bring his bitch ass outside." [Petitioner] was carrying the rifle behind his back.

Guzman came outside and stood near the doorway. The two men began to argue, and [Petitioner] told Guzman to "give [me] the money." Guzman responded that [Petitioner] was stupid and that there was no money. Gonzalez testified that [Petitioner] stated that he was not "playing." The argument went back and forth, until [Petitioner] stated, "If you think I'm fucking playing" and he displayed the rifle. Gonzalez said that Guzman responded that he was not afraid and that "if he was going to shoot, to shoot." Guzman then put his hands up in the air, and he turned to walk away. [Petitioner] stated, "You don't think I'll shoot you, you don't think I'll shoot you." [Petitioner] then fired the rifle, and Guzman was hit in the leg. Guzman went back into the apartment.

Gonzalez ran back to her apartment and called 911. While she was calling, she heard multiple shots. Her mother ran into the apartment and screamed for Gonzalez to call the police as [Petitioner] was shooting Guzman. She called a second time and then walked out onto the street. Gonzalez saw [Petitioner] walking towards the street. He stated, "You think I'm fucking playing. I run this shit." Gonzalez went into her mother's apartment, which was filled with gun smoke. Guzman was on the floor, and her brother Romero was holding him. Gonzalez cut off some of Guzman's clothes and tried to stem the bleeding.

[Petitioner] re-entered the apartment, and Gonzalez and her brother ran into the bedroom. She saw [Petitioner] lean over Guzman and heard him ask Guzman for the money. Gonzalez quoted [Petitioner] as saying that "it didn't have to be like this, that he just wanted the money ." [Petitioner] searched through Guzman's pockets and then stated that he "should have emptied the rest of the clip on him."

When the police arrived, [Petitioner] ran into the bedroom and told Romero to help him hide the gun. Romero lifted the mattress, and [Petitioner] put the gun under the mattress. Gonzalez, Romero, and [Petitioner] were detained by the police and placed on a curb while the apartment was searched. Gonzalez did not immediately identify [Petitioner] to the police, because she was afraid, and [Petitioner] had

told her to tell the police that "some black guy came in and shot him and took off running to the CVS."

Justo Chavez testified that he also lived at the Hamilton Apartments. On the night of the shooting, at about 9 p.m., he was visiting with Gonzalez in front of her apartment, when Guzman spoke to them. Guzman stated that he and [Petitioner] has just been at a 7–Eleven store, where [Petitioner] had tried to show off in front of his girlfriend, and Guzman had "laid him out." Chavez and Guzman then walked to Villareal's apartment. Once inside the apartment, Guzman again recounted the facts of the fight with [Petitioner]. Guzman heard Gonzalez call his name, and he went outside. Chavez saw [Petitioner] and Guzman standing by the front door of the apartment.

[Petitioner] cocked his rifle and stated, "You think I'm fucking playing." Guzman raised both his hands. He stated, "Do what you going to do." Guzman turned around and [Petitioner] shot him in the back of the leg. Guzman ran back into the apartment. When Villareal and Guzman tried to close the door, [Petitioner] shot through the door and hit Guzman a second time. Both Chavez and Guzman tried to run to the bedroom, but [Petitioner] entered the apartment and shot Guzman again. Guzman fell to the floor and tried to reach out to Chavez, but more shots were fired, and Chavez hid in a closet. Chavez heard more shots fired, and he heard Guzman state, "Hey, man. You kill me." Chavez heard [Petitioner] empty the rest of the ammunition clip. Chavez came out of the closet and saw Gonzalez and Romero trying to attend to Guzman's wounds. As Chavez walked out of the apartment, he saw [Petitioner] returning.

Romero Villareal related that he lived in Apt. 102 with his parents. On the night of the shooting, he was at an apartment directly above his. He heard an argument, and he saw [Petitioner] pointing a rifle at Guzman. He stated, "I want my money. You think I'm playing." He saw Guzman turn around and throw up his hands. Villareal heard him say, "If you are going to use it, use it." [Petitioner] shot Guzman in the leg. Guzman grabbed his leg and ran back into the apartment. [Petitioner] shot the door open and went into the apartment. Villareal heard Guzman state, "Stop. You're killing me. You already got me. What are you trying to prove?" He heard more gunshots, and when the shooting finally stopped, he saw [Petitioner] walking away from the apartment. He had his rifle over his shoulder and he stated, "I run things around here. Y'all think I'm playing?"

Villareal went downstairs and went into his apartment. He saw Guzman

on the floor. Chavez came out of the bedroom and walked away. Villareal and his sister, Diane Gonzalez, attempted to give Guzman first aid. [Petitioner] came back into the apartment and everyone scattered. The witness and Gonzalez ran into the bedroom. [Petitioner] asked Guzman, "Do you got my money yet?" [Petitioner] went through Guzman's pockets. When the police arrived, [Petitioner] asked Villareal to help hide the rifle, and it was placed underneath a mattress. The police restrained those in the apartment. [Petitioner] stated to the police that two black guys had shot his uncle and had gone off to CVS.

Berta Villareal testified that on the night of the shooting, Guzman came to her apartment. While they were talking, he got up and went outside. She then saw him put up his hands, and he turned around to come back inside. She heard a gunshot and Guzman grabbed his leg and came into the apartment. He said, "Bertie, he shot me." [Petitioner] tried to enter the apartment, and she tried to close the door, but [Petitioner] fired another shot. [Petitioner] came into the apartment and continued firing. She got behind a sofa. When the firing stopped, she ran to her daughter's apartment and told her to call the police. The witness then saw [Petitioner] walking away saying, "I run shit here. This is how I do it." Villareal went back into her apartment and saw her daughter and son trying to administer to Guzman. [Petitioner] then re-entered the apartment, and Villareal ran out. She told a police officer that [Petitioner] had a rifle in the apartment. She heard [Petitioner] state to an officer that some black guys were shooting and Guzman got caught in the cross-fire.

Dr. Sheila Spotswood, a medical examiner for Dallas County, performed an autopsy on Guzman. She testified that Guzman had been shot six times in the chest, three times in the right arm, and three times in the left leg. Four of the six shots to his chest were fired at close range, approximately one foot away. Dr. Spotswood testified that the victim weighed 210 pounds, and the toxicology report revealed the presence of THC and marijuana. The victim sustained serious injuries to his right lung and liver from the gunshots. The cause of death was multiple gunshot wounds, and the manner of death was homicide.

*Id.*

## Legal Standards

Where a state court has already rejected a claim on the merits, a federal court may grant habeas relief on that claim only if the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary" to clearly established federal law if "it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." *Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir. 2004).

A decision constitutes an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law.... A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 526 U.S. 86, 131 S. Ct. 770, 785–86 (2011) (citations and internal quotation marks omitted). "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible

fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id.* at 786 (internal quotation marks omitted).

The Supreme Court has further explained that "[e]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* (internal quotation marks omitted). And "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* The Supreme Court has explained that, "[i]f this standard is difficult to meet, that is because it was meant to be," where, "[a]s amended by [the Antiterrorism and Effective Death Penalty Act of 1996], § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings," but "[i]t preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents," and "[i]t goes no farther ." *Id.* Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786–87; *accord Burt v. Titlow*, 134 S. Ct. 10, 16 (2013) ("If this standard is difficult to meet–and it is–that is because it was meant to be. We will not lightly conclude that a State's criminal justice system has experienced the

extreme malfunctio[n] for which federal habeas relief is the remedy." (internal quotation marks and citations omitted)).

As to Section 2254(d)(2)'s requirement that a petitioner show that the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," the Supreme Court has explained that "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance" and that federal habeas relief is precluded even where the state court's factual determination is debatable. *Wood v. Allen*, 558 U.S. 290, 301, 303 (2010). Under this standard, "it is not enough to show that a state court's decision was incorrect or erroneous. Rather, a petitioner must show that the decision was objectively unreasonable, a substantially higher threshold requiring the petitioner to show that a reasonable factfinder must conclude that the state court's determination of the facts was unreasonable." *Batchelor v. Cain*, 682 F.3d 400, 405 (5th Cir. 2012) (brackets and internal quotation marks omitted).

The Court must presume that a state court's factual determinations are correct and can find those factual findings unreasonable only where the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e) (1); *Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001). This presumption applies not only to explicit findings of fact but also "to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001); *see also Harrington*, 131 S. Ct. at 784

("[D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning"). "The presumption is especially strong when the state habeas court and the trial court are one in the same," as they were in this case. *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000) (collecting cases); *see also Pippin v. Dretke*, 434 F.3d 782, 792 (5th Cir. 2005) ("A trial court's credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are 'virtually unreviewable' by the federal courts." (quoting *Moore v. Johnson*, 194 F.3d 586, 605 (5th Cir. 1999))).

## Analysis

Petitioner asserts two claims in his petition: (1) that he is actually innocent due to his trial counsel's ineffective assistance and, separately, (2) that he received ineffective assistance of counsel. *See* Dkt. No. 3 at 11, 19 (citing, as to the first claim, *Schlup v. Delo*, 513 U.S. 298 (1995)). But Petitioner admits that "these two Grounds are closely-related and stem from the same errors and omissions of trial counsel," so much so that he chose to "combine [his] arguments [in support of each] into [a single] section" in his brief. *Id.*; *see also id.* at 19 ("The actual innocence claim that Petitioner raises ... is tied to a showing of constitutional error at trial of ineffective assistance of counsel." (again citing *Schlup*)).

Thus, it does not appear that Petitioner is presenting a standalone claim of actual innocence, which is itself not an independent ground for federal habeas corpus relief. To the extent he is, however, a such a claim should be denied. *See McQuiggin*

*v. Perkins*, 133 S. Ct. 1924, 1931 (2013) (citing *Herrera v. Collins*, 506 U.S. 390, 404–05 (1993)); *Reed v. Stephens*, 739 F.3d 753, 766 (5th Cir. 2014) (collecting cases); *see also Schlup*, 513 U.S. at 315 (a claim of innocence invoking *Schlup* "does not by itself provide a basis for relief. Instead, [such a] claim for relief depends critically on the validity of[, for example, a] *Strickland* [or] *Brady* claim[]." Such a claim "is thus 'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'" (quoting *Herrera*, 506 U.S. at 404)).

Accordingly, the Court's review is limited to the only independent constitutional error Petitioner alleges – that he was denied his Sixth Amendment right to reasonably effective assistance of counsel, guaranteed at all critical stages of a criminal proceeding. *See Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980).

To prevail on an ineffective assistance of counsel claim, a habeas petitioner must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011).

First, the petitioner must demonstrate that the performance of his attorney fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687-88. To be cognizable under *Strickland*, trial counsel's error must be "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Second, the petitioner must prove that he was prejudiced by his attorney's substandard performance. *See id.* at 687, 692. "This requires showing

that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id* . at 687.

> [B]ecause of the risk that hindsight bias will cloud a court's review of counsel's trial strategy, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."

*Feldman v. Thaler*, 695 F.3d 372, 378 (5th Cir. 2012) (quoting *Strickland*, 466 U.S. at 689), *cert. denied*, 133 S. Ct. 1584 (2013).

"A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003). Moreover,"[j]ust as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Harrington*, 131 S. Ct. at 791. "The Supreme Court has admonished courts reviewing a state court's denial of habeas relief under AEDPA that they are required not simply to give [the] attorney's the benefit of the doubt, ... but to affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as they did." *Clark v. Thaler*, 673 F.3d 410, 421 (5th Cir. 2012) (internal quotation marks omitted).

And, to demonstrate prejudice, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Thus, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington*, 131 S. Ct. at 791. "Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different," which "does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case." *Id.* at 792 (quoting *Strickland*, 466 U.S. at 693, 696, 697). "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 131 S. Ct. at 792.

Ineffective-assistance-of-counsel claims are considered mixed questions of law and fact and, therefore, are analyzed under the "unreasonable application" standard of 28 U.S.C. § 2254(d)(1). *See Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010). Where, as here, the state court adjudicated an ineffective-assistance claim on the merits, *see* Dkt. No. 9-17 at 31-42, this Court must review Petitioner's claims under the "doubly deferential" standards of both *Strickland* and Section 2254(d), *Pinholster*, 131 S. Ct. at 1403, 1410. In such cases, the "pivotal question" for this Court is not "whether defense counsel's performance fell below *Strickland*'s standard"; it is "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 131 S. Ct. at 785. In other words, the AEDPA does not permit a *de novo* review of state trial counsel's conduct in these claims under *Strickland*. *See id.* at 785–86. Instead, on

federal habeas review of a claim that was fully adjudicated in state court, the state court's determination is granted "a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* at 785.

*Strickland*'s standard is, moreover, "a general one, so the range of reasonable applications is substantial," and because Section 2254(d) applies, the "question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 788. Thus, if the most that a petitioner can demonstrate is that fairminded jurists could disagree on the correctness of the state court's decision as to either deficient performance or prejudice, federal habeas relief is precluded. *See Clark*, 673 F.3d at 422, 424.

Here, Petitioner contends that his trial counsel was ineffective for three reasons: (1) his counsel should have called, but failed to secure the testimony of, Gwendolyn Marez; (2) his counsel failed to present other available evidence; and (3) his counsel otherwise failed to conduct an adequate investigation and exercise a reasonable trial strategy. The state habeas court summarized Petitioner's ineffective-assistance claim as follows: "trial counsel failed to investigate the case and failed to present any of the evidence available tot him at the time of trial." Dkt. No. 9-17 at 32. And that court rendered detailed findings and conclusions, including credibility determinations, as to that claim. *See id.* at 33-41.

Gwendolyn Marez

Petitioner first argues that his trial counsel was ineffective for failing to call his girlfriend at the time of the shooting, Gwendolyn Marez, as a witness. *See* Dkt. No. 3

at 13-15, 19-20. Petitioner does not offer an affidavit from Marez herself but attempts to explain what Marez would have testified to, had she been called, through his own affidavit dated November 17, 2010 [Dkt. No. 3-1, Ex. 5], as well as affidavits from his mother (Juanita Estrada, dated August 13, 2010) and sister (Griselda Tovar, dated July 1, 2010) [Dkt. No. 3-1, Exs. 6 & 7]. And while Petitioner spends considerable energy attempting to establish that these affidavits are admissible, *see* Dkt. No. 3 at 20-21, he does not attempt to rebut the conclusion of the state habeas court – considering the same affidavits – that the affiants are not credible. *See* Dkt. No. 9-17 at 33.

> In their three affidavits, the affiants state that trial counsel did not present a witness named Gwendolyn Marez, who was [Petitioner's] girlfriend at the time of the shooting and who would have testified in support of a claim of self-defense or defense of a third party. Further, in his affidavit, [Petitioner] states that all of the lay witnesses who testified at his trial about the events surrounding [Petitioner] shooting and killing the victim Elizardo Guzman (including Bertha Villareal, Romero Villareal, Diane Gonzalez, Justo Chavez, and Mary Martinez) testified untruthfully. <u>This Court does not find any of these three affiants to be credible</u>.

*Id.*, Findings of Fact, ¶ 1 (emphasis added). The state habeas court went on to conclude that, even if it found the affiants to be credible, their testimony "at best, questions the sufficiency of the evidence." *Id.* at 36, Conclusions of Law, ¶ 7 (noting that "[c]hallenges to the sufficiency of the evidence[ ] are not cognizable in post-conviction proceedings" (citations omitted)).

The state habeas court found Petitioner's trial counsel "to be credible," *id.* at 33, and considered his testimony as to why he did not call Marez as a witness:

> [Petitioner] insisted that he acted in self defense, although I was unable to find a witness that substantiated that position....
>
> [Petitioner] insisted that his girlfriend Gwendolyn Marez would corroborate his version of the events.... My investigator found Ms. Marez and interviewed her during the trial. He advised me that she would state that [Petitioner] armed himself and she drove him to the scene of the crime and that his stated purpose was to kill Mr. Guzman. I decided to not have her brought in as a witness....

*Id.* at 34, Findings of Fact, ¶ 9 (quoting Affidavit of Paul Brauchle, pp. 1-2). In the same affidavit, which the state habeas court further considered in its decision, trial counsel provided that "[t]he shooting was witnesses by several witnesses who testified to the details they observed. All of these witnesses were interviewed by either myself or by my investigator...." *Id.* at 33, Findings of Fact, ¶ 3 (quoting Brauchle Aff., p. 1).

As to trial counsel's actions as to Marez, the state habeas court concluded that "trial counsel explain[ed] very directly and logically why he did not call Gwendolyn Marez as a witness: his investigation revealed that she would not have been a favorable witness to the defense." *Id.* at 40, Conclusions of Law, ¶ 6. And, as to Marez's proffered testimony, the state habeas court further found that,

> even if [Marez] had testified as [Petitioner] argues she would have testified, she would not have been an eyewitness to the shooting, and her testimony therefore would not have overcome the testimony of the multiple eyewitnesses who testified that [Petitioner] gunned down Guzman in pursuit of his share of the proceeds of their theft.

*Id.* at 36, Findings of Fact, ¶ 9.

Petitioner has not addressed the state habeas court's findings and conclusions as to this ineffective-assistance-of-counsel claim. Thus, he "has not met his burden to show that the state habeas court's conclusion on this claim amounted to an

unreasonable application of *Strickland* or an unreasonable determination of the evidence." *Garza v. Stephens*, 738 F.3d 669, 680 (5th Cir. 2013) (citing 28 U.S.C. §§ 2254(d)(1)-(2)); *see also, e.g.*, *Butts v. Morales*, No. 1:12–CV–177 (WLS), 2013 WL 6145335, at *2 (M.D. Ga. Nov. 20, 2013) ("by failing to even address" a state court's finding as to a *Strickland* claim, the petitioner fell "very short of showing that the state court's adjudication of this claim triggers section 2254(d)(1)'s 'unreasonable application' clause").

Moreover, as to the state habeas court's factual determinations, including its credibility determinations, which this Court must presume to be correct and reasonable, Petitioner does not rebut those determinations at all, much less rebut them with "clear and convincing evidence." *See Gardner*, 247 F.3d at 560.

At most, Petitioner calls into question the state habeas court's finding, which relied on the testimony of his trial counsel, that Marez "would not have testified in support of a claim of self defense." Dkt. No. 9-17 at 36, Conclusions of Law, ¶ 12. Petitioner states that that conclusion is "suspect considering that trial counsel refused to tender Petitioner's casefile to [his habeas] counsel" – on October 21, 2009, trial counsel informed habeas counsel that "he no longer [had Petitioner's] file," Dkt. No. 3-1 at 130 – "and because the testimony of Ms. Estrada and Griselda Tovar directly contradicts [counsel's] testimony," Dkt. No. 3, ¶ 63. Petitioner argues that a hearing was – and now is – necessary. *See* Dkt. No. 3, ¶ 63 (contending that the state habeas court "should have allowed Petitioner a hearing to develop this testimony so that the trial court could have considered the credibility of the witnesses").

Again, "[t]he AEDPA requires that the federal court presume correct the state court's findings of fact unless the petitioner 'rebut[s] the presumption of correctness by clear and convincing evidence.'" *Skinner v. Stephens*, Civil Action No. H–12–3769, 2014 WL 549386, at *13 (S.D. Tex. Feb. 10, 2014) (quoting 28 U.S.C. § 2254(e)(1)). This presumption applies "even if the hearing was on the papers rather than a live evidentiary hearing." *Id.* (citing *Valdez*, 274 F.3d at 950-51).

In *Skinner*, the petitioner made, and the court rejected, the same argument that Petitioner makes here: "that the state court erred in accepting [his trial counsel's] affidavit without holding a live evidentiary hearing." *Id.* By claiming "[t]he court should have allowed [him] a hearing," Dkt. No. 3, ¶ 63, Petitioner is merely attacking the state habeas proceeding; such an attack – on a proceeding collateral to the conviction, not the conviction itself – does entitle Petitioner to federal habeas relief. *See, e.g., Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995).

> [Furthermore], the fact that the state court dismissed the habeas petition on the basis of the record, without an evidentiary hearing, does not in itself disturb the presumption of correctness under § 2254(d). Rather, "it is necessary to examine in each case whether a paper hearing is appropriate to the resolution of the factual disputes underlying the petitioner's claim."

*Skinner*, 2014 WL 549386, *13 (quoting *May v. Collins*, 955 F.2d 299, 312 (5th Cir. 1992), and noting, "The Fifth Circuit has consistently recognized that a state habeas court need not hold an evidentiary hearing." (collecting cases)).

Here, as in *Skinner* (and many of the cases it cites), the state court habeas judge was the same judge who presided over the petitioner's trial, "placing the habeas judge

in a better position to determine the credibility of witnesses who submitted affidavits than other courts on direct or collateral review." *Mundine v. Director, TDCJ–CID*, Civil Action No. 4:07cv489, 2011 WL 773402, at *8 (E.D. Tex. Feb. 28, 2011) (citing *Buxton v. Lynaugh*, 879 F.2d 140, 146 (5th Cir. 1989)); *see also Murphy v. Johnson*, 205 F.3d 809, 813 (5th Cir. 2000) (Section 2254(e)(1)'s "presumption is especially strong when, as here, the state habeas court and the trial court are one and the same." (citations omitted)); *Arvelo v. Attorney General, Fla.*, No. 8:07–CV–1107–T–30EAJ, 2009 WL 248366, at *9 (M.D. Fla. Feb. 2, 2009) ("the ultimate determination as to the credibility of the witnesses was within the sound discretion of the state court[,]" and a petitioner's interpretation of the same "is unavailing" where the petitioner "fails to rebut the presumption of correctness regarding the court's credibility finding by clear and convincing evidence" (internal quotation marks and citations omitted)).

Although Petitioner has failed to offer clear and convincing evidence to rebut the state court credibility determinations, made without a hearing, *see* 28 U.S.C. § 2254(e)(1), the undersigned has independently reviewed the record in this case. And that review has confirmed the state habeas/trial judge's conclusion that there is no need for a live hearing where the facts were adequately developed to permit resolution of Petitioner's claims on the basis of the record and without an evidentiary hearing.

<u>Trial counsel's presentation of other evidence and trial strategy generally</u>

Petitioner alleges that his trial counsel was constitutionally ineffective because counsel failed to present evidence of self-defense and second-degree Murder. *See* Dkt. No. 3 at 22-26. Relatedly, Petitioner contends that his counsel's trial strategy – his

alleged "failure to present any of the evidence available to him" – coupled with trial counsel's alleged failure to conduct a proper legal and factual investigation also supports a Sixth Amendment claim. *Id.* at 27-30.

In addition to addressing ineffective-assistance claims specific to counsel's decision not to call Marez as a witness, the state habeas court made findings and conclusions as to claims that Petitioner's trial counsel failed to present evidence and otherwise exercise a sound and reasonable trial strategy. *See* Dkt. No. 9-17 at 37-41.

The state court found trial counsel "to be credible," *id.* at 33, 37, and relied on trial counsel's testimony "that either he or his investigator interviewed all the State's witnesses to the shooting," *id.* at 37, and that, because he could not find a witness to substantiate Petitioner's insistence that he acted in self-defense, "[t]he trial strategy [ ] became to show that the offense did not occur during the course of a robbery," *id.*

The state habeas court then made multiple findings related to counsel's effective performance during the course of trial, *see id.* at 38-39, Findings of Fact, ¶¶ 7-17, before concluding that Petitioner failed to establish that his trial counsel rendered ineffective assistance, *see id.* at 39, Conclusions of Law, ¶¶ 1, 2 (Petitioner's "allegations against trial counsel are refuted by the record and without merit."); *see also id.* at 40-41, Conclusions of Law , ¶¶ 6-12 (among other matters, concluding that the trial and habeas record established that counsel "investigated [Petitioner's] case prior to trial; that counsel formulated a comprehensive understanding of the facts of the case sufficient to present an adequate"; and that counsel may have determined it

was sound strategy not to call Petitioner's mother and sister as witnesses at the guilt-innocent stage of trial).

To the extent that Petitioner claims that his trial counsel was ineffective for advising him not to testify at trial, *see* Dkt. No. 1 at 9, the state habeas court found that the trial record establishes that counsel informed Petitioner, on the record, of his right to testify and that Petitioner made an informed decision not to testify on his own behalf. *See* Dkt. No. 9-17 at 39, Findings of Fact, ¶ 17 (Petitioner "specifically testified: that, although he initially wanted to testify and understood he had the right to testify in his own behalf, he decided that he did not want to testify; [and] that he had not been threatened or coerced into not testifying...").

As to these claims, once again, Petitioner fails to attempt "to show that the state habeas court's conclusion ... amounted to an unreasonable application of *Strickland* or an unreasonable determination of the evidence." *Garza*, 738 F.3d at 680. *See* Dkt. No. 3 at 30-32. At most, Petitioner merely urges this Court to undertake a *de novo* review of his trial counsel's conduct under *Strickland*, *see* Dkt. No. 3 at 22-30, which is prohibited when, like here, the ineffective-assistance claims were fully adjudicated in state court, *see Harrington*, 131 S. Ct. at 785-86.

<u>Petitioner's alternative request for a new punishment hearing</u>

Petitioner asserts that "[c]laims of newly-discovered evidence may also be raised for the purposes of obtaining a new punishment hearing." Dkt. No. 3 at 19 (citing *Ex parte Chavez*, 213 S.W.3d 320 (Tex. Crim. App. 2006), in which the Court of Criminal Appeals noted that, while "the concept of actual innocence does not translate in a

logical way to the factfinder's determination of what punishment to assess within a legislatively prescribed term of years," that does not means "that principles of due process do not apply at the punishment phase of a non-capital trial. In some future case in which newly discovered or newly available evidence arises that casts substantial doubt upon the reliability of the sentencer's assessment of a particular term of years, we may well hold that the accused should receive a new punishment proceeding."); *see also id.* at 32.

Petitioner requests that this Court "reverse the judgment and remand this case to the [state] trial court for a punishment hearing." *Id.* ("Petitioner has cast a substantial doubt upon the reliability of the jury's assessment of seventy years in prison, and this Court should thus hold that Petitioner should receive a new punishment hearing.").

To the extent that, through this request, Petitioner is asserting a separate claim of actual innocence, relief for actual innocence is not available through this federal habeas petition. *See, e.g., McQuiggin*, 133 S. Ct. at 1931. This request, moreover, was presented to – and rejected by – the state habeas court. *See* Dkt. No. 9-17 at 6-7 (the "claim is without merit because [Petitioner] has not established any newly-discovered evidence 'that cast substantial doubt upon the reliability of the sentencer's assessment of [the] particular terms of years' in this case" (quoting *Chavez*, 213 S.W.3d at 326)). As to this alternative request for relief, Petitioner again has not shown that the state court's adjudication is either "contrary to, or involved an unreasonable application of, clearly established Federal law" or "based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1)-(2).

Petitioner's counsel made the decision not to call Marez as a witness at trial after concluding that what she had to say – information that Marez relayed to counsel's investigator during trial – would not benefit Petitoner. Thus, Marez's testimony itself cannot be "newly-discovered evidence." Petitioner instead appears to relies on the testimony of affiants whom the state habeas court found to not be credible in an attempt to establish Marez's testimony – as related to the discredited affiants – would have been not only favorable but would have cast substantial doubt as to his 70-year sentence. But, even if an actual-innocence-based claim was available to him, Petitioner cannot "repackage" old evidence to support such a claim. *Cf. Crutsinger v. Thaler*, No. 4:07-CV-703-Y, 2012 WL 369927, at *13-*14 (N.D. Tex. Feb. 6, 2012) ("Even if this [actual innocence] claim were cognizable, it would fail on the merits.... Petitioner presents no new evidence of his innocence, but rather a legal theory based on evidence that was available at the time of trial.").

On review of the papers, pleadings and records in this case, the undersigned concludes that Petitioner has failed to establish that the state court's adjudication of his grounds for habeas relief resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Petitioner has further failed to demonstrate that the state court's decision was based upon an unreasonable determination of the facts

in light of the evidence presented in the state court proceedings. *See Williams*, 529 U.S. at 412-13; *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000).

## Recommendation

Petitioner's application for write of habeas corpus should be denied.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: October 24, 2014

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE